**CORRECTED**

**EXHIBIT B TO PLAINTIFF'S REPLY BRIEF**

Page 185

1   Q.  You did or you did not?
2   A.  No. I didn't got this on my orientation
3   class. They gave me one, like, after working for them,
4   pretty much, like, a month after being an employee, and
5   these documents. I don't remember none of this. I
6   remember they gave me something like this, just this.
7   And this color. I have the paper like this, and this is
8   this way but not like this.
9   Q.  Okay. I can represent that it was produced
10  just the way you described, which is one page per piece
11  of paper in a vertical form, but I copied it for
12  purposes of this deposition with two pages on each just
13  to use less paper to save some trees.
14       MR. DOWNEY: Very kind of you.
15       MS. RAPPAPORT: The same document that you
16  produced; it's just smaller.
17  BY MS. RAPPAPORT:
18  Q.  But if you want to look through it and just
19  make sure it looks the same, I understand.
20       Are you -- you want to review all the pages
21  before I ask you questions?
22  A.  Yeah, please.
23  Q.  Okay. It is the handbook that was produced
24  to me. There was no Bates stamp number so I can't prove
25  it.

Page 186

1   A.  I'm on the meal -- meal and rest break
2   policy.
3   Q.  Yes.
4   A.  It says here employees are required to take
5   a 30-minute -- paid 30 free meal break towards the end
6   of the fifth hour of work. A few times I took my first
7   30-minutes break after the fifth hour.
8   Q.  Right.
9   A.  Almost time of taking my last break.
10       And it says that an employee that work more
11  than ten hours will have the option to take a second
12  30-minute and paid duty free. They never offer me no
13  other -- after my tenth hour. They never even talk
14  about that over there, so I didn't know about that one.
15  They never told me anything about that.
16  Q.  Okay. So have you seen this handbook
17  before, or you haven't seen it before today?
18  A.  Yes. I have seen it, but it wasn't there.
19  I'm reading a couple of stuff little by little, and I
20  also saw -- let me see --
21  Q.  Okay. Let me ask you a question. So you're
22  telling me that -- that -- that the document that was
23  produced by your counsel to Leprino in this lawsuit
24  called the "Employee Guidebook" is a document you
25  haven't seen before?

Page 187

1   A.  No. I haven't seen this one.
2   Q.  Okay.
3   A.  With this information that I have read so
4   far.
5   Q.  Okay.
6   A.  It looked like they have more new stuff.
7   Q.  Okay. So where did you get the guidebook
8   that you produced in this lawsuit?
9        MR. DOWNEY: Objection. Attorney-client
10  privilege, word product privilege. You're making the
11  assumption that it was produced by him to myself. I'm
12  not saying it was; I'm not saying it wasn't. But...
13       MS. RAPPAPORT: Well, this document requests the
14  plaintiff, and in response to document requests, I got
15  this hand- -- I got this guidebook. So I assumed it
16  was being produced by plaintiff.
17       MR. DOWNEY: Document request of plaintiff's
18  counsel.
19       MS. RAPPAPORT: Okay. Well, I directed the
20  request to the plaintiff.
21  BY MS. RAPPAPORT:
22  Q.  And so, I guess, as we sit here today,
23  you've never seen this handbook before? This guidebook?
24  Even in a different form where it was full pages?
25  A.  I saw the one like the way I just explained

Page 188

1   to you, and I got that eight month after being an
2   employee -- employee with Leprino.
3   Q.  Right --
4   A.  And I read it on their stuff that wasn't on
5   the one I got. And it looked way different than this
6   one, so...
7   Q.  Okay. Do you have copy of the one you got?
8   A.  I believe I -- the only I had it, I gave it
9   to my --
10       MR. DOWNEY: Objection.
11       Do not state anything concerning discussions
12  with attorney.
13       MS. RAPPAPORT: Well, but if you gave a copy -- if
14  you have a copy of the guidebook that you -- you gave a
15  copy of the guidebook to your attorney, I need to get a
16  copy of what was given to your attorney, what you had in
17  your possession from Leprino. You know, perhaps you
18  can -- your attorney can clear it up. I mean, the
19  guidebook that -- that you produced to me, is it the one
20  that the plaintiff had or not? Because if it wasn't, I
21  want the one the plaintiff had because that is what I
22  requested in my document request.
23       MR. DOWNEY: I don't have an answer for that for
24  you.
25       MS. RAPPAPORT: Okay.



Page 201

1 everything that's in the handbook before today; is that
2 correct?
3  A. Not all the book, but I have read -- I got
4 to read some of the book.
5  Q. Okay.
6  A. Yeah.
7  Q. So do you want to change your testimony
8 about the meal and rest break policy that was on
9 Page 12? You said you had never seen that policy
10 before. Do you want to change your testimony, or is
11 it -- was truly today the first day you've seen it?
12  A. No. I saw that the -- my point on it is
13 that it says the thing over there, but they really don't
14 do what is even on the policy.
15  Q. That's not my question. I just -- had you
16 seen the policy before?
17  A. Yes.
18  Q. Okay. And the same with the uniform policy.
19 Had you seen it before today, or is today the first time
20 you read that?
21  A. That one actually was today. I really
22 didn't pay attention on it, because I already got told
23 how to do about the uniform and clocking in and all of
24 that stuff. So...
25  MS. RAPPAPORT: Okay. Let me give this back to

Page 202

1 counsel.
2  MR. DOWNEY: Thank you.
3  MS. RAPPAPORT: Because I don't think we need it
4 on the record.
5  MR. DOWNEY: My apologies for the confusion.
6  MS. RAPPAPORT: I think it was the way I
7 photocopied it that caused all the problems, so I
8 apologize as well.
9 BY MS. RAPPAPORT:
10  Q. Okay. So before we went off the record, you
11 said that the supervisors named Monica, Darren, somebody
12 Blankenship, Tiffany, Jennifer, Val, and Manuel told you
13 that you had to put on your uniform before clocking in?
14  A. They didn't told just me; they told general
15 in the preshift office, in preshift meeting let's
16 say before a shift, there's pretty much a meeting in the
17 office.
18  Q. I'm asking you specifically: What did each
19 of these supervisors say about clocking in and uniforms?
20  A. You have to wear your uniform before
21 clocking in, and as soon as you clock in, you have to go
22 straight to the preshift office.
23  Q. Every one of the supervisors that I
24 mentioned, that I named here, told you that?
25  A. They said that, yes.

Page 203

1  Q. And did every one of these supervisors tell
2 you that you must clock out before taking off your
3 uniform?
4  A. Yes.
5  Q. They did? What did they say specifically?
6 What did Monica say on that?
7  A. You're saying -- excuse me. You're saying
8 it like they just being talking just to me. You know,
9 it's in general what they say. We have by their rule
10 what they have -- they have went over on the meetings
11 that we have to wear our uniform before clocking in.
12 Make sure we are wearing it correctly. And then to
13 clock out, as soon as we get relieved from the next
14 shift. We have to clock out first and then take out
15 your uniform and go home. That's what I got told to do.
16  Q. And that's what you did.
17  A. Well, yeah. They're my supervisor. I
18 follow rules.
19  Q. Did you observe other people clocking out at
20 the end of day and then changing out of their uniform?
21  A. Yes.
22  Q. Who did you observe doing that?
23  A. I don't remember names. From all the
24 department, there's people from all the departments, so
25 I don't know everybody in the factory.

Page 204

1  Q. Did you observe anybody change out of their
2 uniform and clock out wearing street clothes?
3  MR. DOWNEY: Objection. Vague and ambiguous.
4   You may answer.
5  THE WITNESS: What was your question again?
6 BY MS. RAPPAPORT:
7  Q. Did you ever observe anybody who was
8 clocking out at the end of the day wearing their regular
9 clothes and not their uniform?
10  A. They were clocking out first and then
11 walking out. Dump the uniform and then clock out --
12  Q. Did you ever observe anybody clock out for
13 the day wearing their regular clothes?
14  A. Walking out?
15  Q. Yes.
16  A. From the factory?
17  Q. Clocking out. Clocking out.
18  A. With the uniform, I just told you.
19  Q. It's a yes or no question. Did you ever --
20  A. I said yes. I said yes.
21  Q. You did observe somebody clocking out in
22 their regular clothes.
23  A. With -- no. I just told you, with the
24 uniform. You're just trying to confuse me, and that's
25 not going to happen. I already explained to you how I



Page 209

1  ///
2  BY MS. RAPPAPORT:
3      Q.  When you left the plant.
4      A.  When I got on the locker room or when I left
5  the plant?
6      Q.  When you came back from lunch after leaving
7  the plant, did you clock in before you went to the
8  locker room?
9      A.  No. I have -- I had to make sure I was
10 there on time to be ready to clock in back from lunch
11 and be on the floor on time.
12     Q.  What does that mean?
13     A.  No. I was -- I had -- I was wearing my --
14 my work boots before clocking back in for lunch.
15     Q.  So you would come back from lunch, go to the
16 locker room, put on your work boots, go back out to the
17 main entrance, and clock in?
18     A.  Yeah.
19     Q.  And after clocking in when you came back
20 from lunch, you then had to go do the air shower room?
21     A.  Yeah. Go through all the process again.
22     Q.  Okay. Did you ever hear from anybody at
23 Leprino Lemoore West facility that preshift started
24 seven minutes after your shift time began?
25     MR. DOWNEY:  Objection. Vague and ambiguous,

Page 210

1  compound question.
2  BY MS. RAPPAPORT:
3      Q.  Do you understand the question?
4      A.  Yes, I do.
5      Q.  What's the answer?
6      A.  I don't know.
7      Q.  You don't know if anybody ever told you
8  that?
9      A.  I got told what I just told you earlier, you
10 know.
11     Q.  No. No. My question is --
12     A.  Same thing over and over, you know. We --
13 we have a certain time to clock in and to be ready
14 before going to the office. So it's the same thing on
15 all the -- not even on that question.
16     Q.  Did anybody ever tell you that you did --
17 that you had to clock in at 10:00 o'clock -- by 10:00
18 o'clock but that your preshift did not start until
19 10:07?
20     A.  We had to clock in seven minutes, no less
21 than five before 10:00 to be at 10:00 at the preshift
22 office already. That's what I just told you earlier.
23     Q.  Okay. I'm going to have her read the
24 question back, because you're not listening to my
25 question. Okay?

Page 211

1      A.  Okay.
2      Q.  It's and really important or we're going to
3  be here a real long time, because I just -- I have to
4  get answers to my questions.
5          You can read it back.
6          (Record read.)
7      THE WITNESS:  No.
8  BY MS. RAPPAPORT:
9      Q.  Did you ever receive any training on using
10 the time clocks other than the -- during orientation
11 when they recorded your finger?
12     A.  No. Just that.
13     Q.  Was it your understanding that you had to be
14 punched in, in order to be on the production floor?
15     A.  Repeat that again.
16     Q.  Was it your understanding that you had to be
17 punched in, in order to be on the production floor?
18     A.  What do you mean, my understanding? What's
19 that?
20     Q.  Do you know what the word "understanding"
21 means?
22     A.  I know what is understand, but my
23 understanding, I don't get it.
24     Q.  What did you -- did you understand --
25     A.  I know my own --

Page 212

1      Q.  Go ahead.
2      A.  That's what it means?
3      Q.  Right.
4      A.  I don't make my own decisions.
5      Q.  What was your understanding of the rule?
6      MR. DOWNEY:  Try rephrasing it, if you could,
7  without that word "understanding," which he seems not to
8  understand. Not to be repetitive. If you can.
9  BY MS. RAPPAPORT:
10     Q.  Were you allowed to be on the production
11 floor without clocking in first?
12     A.  No.
13     Q.  So you had to clock in, in order to go to
14 the production floor?
15     A.  Yes.
16     Q.  Okay. And what happens if you missed
17 clocking in? If you didn't clock in on your way in?
18     A.  You have to notify your supervisor.
19     Q.  And then?
20     A.  You can get punishment for that.
21     Q.  What kind of punishment?
22     A.  A write-up or points.
23     Q.  Did that ever happen to you?
24     A.  Not that I remember. I don't think so.
25     Q.  Did you have to purchase from Leprino the



Page 233

1  paycheck, where your said this looked wrong and you went
2  to HR or anything like that?
3      A.  Yes, I did.
4      Q.  Okay.  When?
5      A.  I believe it was on my second or third
6  check, but it was because of my schedule rotation, so I
7  didn't realize when they -- I didn't know when they
8  close the week of the pay period and three days off out
9  of that week, so they explained to me and -- yeah, we
10 took numbers, and they really paid me the right thing.
11 I was just wrong.  I didn't know some stuff.
12     Q.  Any other occasion where you questioned a
13 paycheck?
14     A.  Not as I remember.
15         THE VIDEOGRAPHER:  We're off the record at 5:53.
16             (Recess.)
17         THE VIDEOGRAPHER:  At this point we are back on
18 the record at 6:01.  This ends Media Number 4 in the
19 deposition of John Talavera.  We are off the record at
20 6:01.
21             (Off the record.)
22         THE VIDEOGRAPHER:  This begins Media Number 5 in
23 the continuing deposition of Jonathan Talavera.  Today's
24 date is July 17, 2015.  We're back on the record at
25 6:04.

Page 234

1  ///
2  BY MS. RAPPAPORT:
3      Q.  When you were a Placement Pros employee
4  working at Leprino, you said you did the same -- used
5  the same time clock as when you became a Leprino
6  employee?
7          MR. DOWNEY:  Objection.  Legal conclusion.
8              You may answer.
9          THE WITNESS:  Yes.
10 BY MS. RAPPORT:
11     Q.  At that time did you keep any records of
12 your hours worked yourself?
13     A.  No.
14     Q.  Was there ever an occasion when you were a
15 Placement Pros employee working at Leprino where your
16 paycheck did not appear to reflect all the hours that
17 you worked?
18         MR. DOWNEY:  Objection.  Question contains a legal
19 conclusion.  He was an employee of Placement Pros.
20             You may answer.
21         THE WITNESS:  I don't remember.
22 BY MS. RAPPORT:
23     Q.  You don't remember?
24     A.  Don't remember.
25     Q.  Is there anything you could do to refresh

Page 235

1  your memory?
2      A.  I don't know.  Maybe, yeah.  I don't know.
3      Q.  What could you do to refresh your memory?
4      A.  I don't know.
5              (Reporter clarification.)
6      Q.  What did you say?
7      A.  I said I don't know.
8      Q.  So as you sit here today, you can't think of
9  anything that would refresh your memory as to whether
10 there was an occasion when you worked for Placement Pros
11 where your paycheck did not appear to reflect all the
12 hours that you worked at Leprino?
13     A.  Not that I remember.
14     Q.  And there's nothing that you can think of
15 that would refresh your memory on that?
16         MR. DOWNEY:  Objection.  Asked and answered.
17             You may answer.
18         THE WITNESS:  I don't remember.  I don't know.  I
19 don't know.  Because I -- I really don't know.  It's a
20 different thing when you're working with a company than
21 when you're working through the agency, so it's a whole
22 different thing, you know.  But I really -- I don't
23 really remember anything of that.
24 BY MS. RAPPORT:
25     Q.  Right.  No.  I understand you don't

Page 236

1  remember.  I'm just asking, is there something that you
2  could look at that might help you remember?
3      A.  I don't think so.  I'm not sure.  Just
4  because it's a whole different thing, you know.  If I
5  might have a way to find my -- that said about time or
6  I'm not sure about my pay.  I cannot go to Leprino and
7  tell them, oh, I want to have my time.  You know, I
8  don't know how they work that out with the agency, so I
9  really don't know.
10     Q.  Well, right.  I'm not asking you how they
11 worked it out; I'm asking you if there was ever a time
12 where it didn't look right to you.
13     A.  I don't know.  It's a whole different thing.
14 Even the pay stuff, I cannot -- they say how many hours
15 I worked, and I -- yeah, I was having an idea of it was
16 right or not.  But, like, on a specific time where I can
17 say, oh, you owe me 30 minutes, for example, I really
18 don't know.
19     Q.  Do you ever recall going to Placement Pros
20 with a question about your paycheck that you received
21 reflecting hours working at Leprino?
22     A.  Not as I remember.
23     Q.  And is there anything you could do that
24 would help you to remember?
25     A.  Maybe yes, maybe not.  I don't know.  I



Page 241

1  MR. DOWNEY: That's okay.
2  BY MS. RAPPORT:
3  Q. So you go back in -- you go out at midnight
4  but go back in at midnight, and I can represent to you
5  that the clock does that because it's a new day.
6  A. I have 3:04 here. I don't get it --
7  Q. It's a lunch break you see you clocked out
8  at 3:04 a.m. and back in at 3:34 a.m.?
9  A. Okay.
10  Q. And then out for the day, if you take that,
11  clock out for the date at 8:57 a.m. You see that?
12  A. Yes.
13  Q. That's an example of a day where you worked
14  ten 1/2 hours; correct?
15  A. Okay. Yes.
16  Q. Okay.
17  A. But I don't get your question about the
18  12:00 a.m., whatever it is. Yeah, the 12:00 a.m.
19  Q. Yeah. I was just pointing out that the time
20  records, because you worked the third shift --
21  A. Yes.
22  Q. -- the time records automatically clock you
23  out at midnight but then back in at midnight for the
24  next day.
25  A. Oh, yeah. I know that. Yeah.

Page 242

1  Q. That's all. You didn't stop working --
2  A. Oh, that's why I was getting confused --
3  Q. Right.
4  A. -- I was like what she trying to ^ say with
5  it. Okay. Sorry about that.
6  Q. So -- so you understand that you didn't stop
7  working at midnight, but the time clock changed because
8  it was now a new day.
9  A. Actually, I didn't knew the clock was doing
10  that, but I assume that, yeah, it have to be like that,
11  different day.
12  Q. Exactly.
13  A. Yeah.
14  Q. And so -- so you worked ten 1/2 hours on
15  November 17th, but you don't recall taking a second
16  lunch break.
17  A. I never took any second lunch break. No one
18  told me about it.
19  Q. Right.
20  A. And I cannot abandon the workplace just
21  because either I know, I didn't know about a lunch if I
22  don't get relief. Because I can get in serious trouble
23  with the company, either a write-up or up to a
24  termination.
25  Q. And break relief rotates through all the

Page 243

1  position; correct?
2  A. What was that?
3  Q. The break relief person rotates through all
4  the positions to break everybody; is that correct?
5  A. Yeah.
6  Q. And so is it your testimony that the break
7  relief didn't come around a second time for you on the
8  days that you worked more than ten hours?
9  A. No. Because pretty much by the time I was
10  supposed to get a -- if it's after the ten hours, my
11  break relief from the night is not going to be same one
12  for the morning after staying over. If someone from the
13  first shift, we wasn't able to walk in on their preshift
14  to know who was going to be the break relief we wasn't
15  getting either paper, like on third shift, about what
16  position you are going to be doing what. We was just
17  waiting for them to come down to the floor to start
18  cleaning while they were coming up for their preshift,
19  and then the group leader was telling you -- coming to
20  you and saying, hey, you're going to be doing this or
21  you're going to be doing that. They wasn't telling me
22  who was the break relief, if I had or not to go take
23  another 30-minute lunch, nothing of that. Just do what
24  I have to do and then go home after getting everything
25  inspected. But never -- I never got a second 30-minute

Page 244

1  lunch.
2  Q. Um, so the break relief from the first shift
3  never came around to break you?
4  A. No.
5  Q. Okay. And would -- would it have been your
6  preference to work an extra half hour in order to take a
7  30-minute lunch break after ten hours?
8  A. I never got told none of that. I just take
9  the overtime.
10  Q. Right. Well, that's not my question. My
11  question is: Would it have been your preference to work
12  a half hour longer in order to take a 30-minute lunch
13  break, second lunch break?
14  MR. DOWNEY: Objection. Vague and ambiguous.
15  THE WITNESS: I would prefer getting another lunch
16  while on that overtime period, because most of the time
17  I was getting skipped, even my last break, so I had to
18  work -- they skipped my last break, then they know that
19  I'm not getting another lunch, so I would prefer if they
20  working the things right, how they supposed to, getting
21  my other lunch and including, actually, my last break on
22  my normal shift, of course.
23  BY MS. RAPPAPORT:
24  Q. And if you had taken a 30-minute unpaid
25  lunch break on that day, you would have had 30 minutes



Page 245

1  less of overtime pay; isn't that right?
2      A.  What was that?
3      MR. DOWNEY: Objection.
4          (Reporter clarification.)
5      MR. DOWNEY: Foundation -- foundation. Leave it
6  at that.
7  BY MS. RAPPORT:
8      Q.  So on a day -- this day, for example, where
9  you worked 10 1/2 hours, you got 2 1/2 hours of
10 overtime; correct?
11     A.  Yeah.
12     Q.  And if you had taken a second 30-minute
13 unpaid lunch break, you would have only gotten two hours
14 of overtime; correct?
15     MR. DOWNEY: Objection. That statement is not
16 supported by the facts in evidence. Calls for a
17 conclusion, foundation, also a legal conclusion. I'm
18 sorry.
19         You can answer.
20     THE WITNESS: Okay. Let see if I can -- repeat it
21 one more time. I just want to make sure I -- I
22 understood your question.
23 BY MS. RAPPORT:
24     Q.  When you worked 10 1/2 hours, you got 2 1/2
25 hours of overtime pay; correct?

Page 246

1      A.  Yeah.
2      Q.  And if you took 30 minutes of that 10 1/2
3  hours to take an unpaid meal break, you'd only get
4  two hours of overtime pay; correct?
5      A.  No. You still got to work to complete those
6  30 minutes if you took a lunch.
7      Q.  So you take a 30 minute and then stay an
8  extra half hour?
9      A.  Pretty much, to complete the hours or the
10 duty, yeah.
11     Q.  And that would have been --
12     A.  It's pretty much, like -- that's how it
13 works, because it's, like, they go in at 10:00, for
14 example, and we don't get off at 6:00; we get off at
15 6:30, so those 30 minutes you get from your lunch, you
16 work.
17     Q.  Right. Right.
18     A.  Since I never took a second lunch period, I
19 cannot tell you if I was going to get paid either more
20 or the right thing or less, because I don't know.
21     Q.  If you had to choose between working 2 1/2
22 hours of overtime or two hours of overtime plus a
23 30-minute unpaid lunch break, which would you choose?
24     MR. DOWNEY: Objection. Incomplete hypothetical,
25 foundation, assumes facts not in evidence, calls for

Page 247

1  speculation about a factual scenario that never existed.
2      But if you're able to answer that question,
3  go ahead.
4      THE WITNESS: Okay. Can you repeat the question?
5      MS. RAPPAPORT: I'll have her read it back.
6      MR. DOWNEY: And I'll just say same objection so I
7  don't interrupt.
8          (Record read.)
9      MR. DOWNEY: Same objection.
10     THE WITNESS: I would prefer to get to work
11 two hours overtime and get my 30-minute period.
12 BY MS. RAPPORT:
13     Q.  Can you recall an occasion where you worked
14 more than ten hours and you took a third rest break?
15     A.  Working -- after working more than
16 ten hours, a third rest break?
17     Q.  Right.
18     MR. DOWNEY: Objection. Mischaracterizes previous
19 testimony.
20     THE WITNESS: I wasn't even getting it on my
21 regular schedule period. How I'm going to get it on the
22 overtime if I don't even got a 30-minute how we supposed
23 to? I don't get your question. So no, I didn't got no
24 breaks. After working more than ten hours, I never got
25 no break.

Page 248

1  ///
2  BY MS. RAPPORT:
3      Q.  What about a shift change? No break?
4      A.  Shift change?
5      Q.  A shift change. After eight hours when the
6  night shift -- when the first shift was coming in.
7      A.  I cannot leave the floor just because.
8      MR. DOWNEY: Objection. Asked and answered.
9  BY MS. RAPPORT:
10     Q.  On how many days would you say you did not
11 get your second rest break?
12     A.  I cannot tell you on a specific date, but it
13 was often that I wasn't -- I was getting my last break
14 skipped, because their production was busy.
15     Q.  When you say "often," what do you mean?
16     A.  Well, every time they were getting busy,
17 let's say, two or three days out of the week, because
18 they always busy out there, you don't get your last
19 break. You get first lunch and that's it. And then if
20 you work more than -- you have to stay over, that's all
21 you got. First break and lunch; that's it.
22     MS. RAPPORT: I'm marking as Exhibit...
23     THE WITNESS: 12.
24     MS. RAPPORT: 12, thank you.
25         A one-page earning statement Bates

Page 297

1  (Off the record.)
2  THE VIDEOGRAPHER: This begins Media Number 6 in
3  the continuing deposit of Jonathan Talavera. Today's
4  date is still July 17th, 2015. We're back on the record
5  at 7:41.
6  BY MR. DOWNEY:
7  Q. Mr. Talavera, previously you were asked
8  questions concerning Exhibit 12 and 13, which are
9  earning statements for Jonathan Talavera. And your
10 attention was directed to penalty pay, where it had a --
11 you were paid one hour of penalty pay here, your meal
12 break having started after five hours. Do you recall
13 that discussion?
14 A. I didn't know that they were paying me for
15 that. I never got told about it, but...
16 Q. Right. But let's listen to the question,
17 please. Do you recall the discussion you had with
18 defense counsel about this being paid to you because
19 your meal break started after five hours?
20 A. Yes. She told me about it.
21 Q. Okay. To your knowledge, were you ever paid
22 an hour of penalty pay for your second 15-minute rest
23 break being skipped?
24 A. I don't remember getting -- I don't -- I
25 didn't know they paid or I was getting a penalty pay.

Page 298

1  Q. Right. Do you believe you were ever paid
2  for skipping your 15-minute -- skipping your second
3  15-minute rest break?
4  A. I don't think so.
5  Q. All right. How about your -- your second
6  30-minute meal break on days of ten hours or longer?
7  Did they ever pay you an hour of penalty pay on days
8  they didn't offer you a second 30-minute meal break?
9  (Reporter clarification.)
10 THE WITNESS: I never saw none of that on any of
11 my paychecks.
12 BY MR. DOWNEY:
13 Q. Did you ever see anybody walk off the
14 production floor in any of the departments you worked in
15 after ten hours of work to go take a second 30-minute
16 meal break?
17 A. I never saw no one taking a second meal
18 break.
19 Q. Did your group leaders or supervisors ever
20 tell you, you can take a second 30-minute meal break if
21 you want to?
22 A. No. I never got told that.
23 Q. And on days of ten hours or longer?
24 A. Never got told about it.
25 Q. Did you used to work back-to-back shifts

Page 299

1  sometimes?
2  A. Yeah. If they were needing me, yeah.
3  Q. Any idea what the most amount of hours that
4  you ever worked on any particular day?
5  A. Thirteen and a half.
6  Q. On that day were you offered a second
7  30-minute meal break?
8  A. No. No break at all.
9  Q. What's been marked as Exhibit A, do you see
10 a date anywhere on this exhibit? Any dates on here? If
11 you see it. Go ahead.
12 A. Let me see close because I really don't --
13 no. I don't see any date on here.
14 Q. Okay. Now --
15 A. I can barely even tell those letters, but I
16 don't see no date.
17 Q. Fair enough. Is this the Kronos punch clock
18 that -- or one of the Kronos punch clocks that you used
19 to punch in at when you were coming on -- coming onto
20 the production floor?
21 A. Yes. Before going on the floor, yeah.
22 Q. And when you punched in here, did you have
23 on your coveralls or your uniform?
24 A. I already had that on before, yeah.
25 Q. All right. And after you punched in here,

Page 300

1  you would put on some other things; is that correct?
2  A. After punching in?
3  Q. Yes. You would put on apron and gloves?
4  A. Yeah. Yeah. After punching in, yeah.
5  Q. Okay. Was this sign that says "Employees
6  are wanted to take a 30-minute lunch break relieved of
7  all duty," was that -- was that signed posted, if you
8  recall?
9  A. Yes, it was. I remember that.
10 Q. All right. Give me one moment please.
11 Now, I'm going to read what's on what
12 appears to be paper under plastic on Exhibit A -- on
13 Exhibit 8 -- excuse me -- and then I'm going to read
14 what's in Exhibit 9, which is that -- the handbook that
15 we -- we went through.
16 The first paragraph of Exhibit 8 and what
17 appears to be paper under clear plastic reads,
18 "Employees are required to take a 30-minute, duty-free
19 meal break prior to the end of the fifth hour of work.
20 Employees who work an excess of ten hours in a day are
21 required to take a second 30-minute, unpaid, duty-feel
22 meal break prior to the end of the tenth hour of work."
23 However, the handbook, which is the handbook
24 you were --
25 MS. RAPPORT: I'm just going to object --



800.211.DEPO (3376)
EsquireSolutions.com